**B. K. SWEENEY COMPANY,**
Plaintiff in Error,

v.

**COLORADO INTERSTATE GAS COMPANY,** Trustee for and on behalf of Sringfield Insurance Company, Defendant in Error.

No. 41317.

Supreme Court of Oklahoma.

April 18, 1967.

Rehearing Denied July 11, 1967.

J. A. O'Toole, Oklahoma City, for plaintiff in error.

Rinehart & Morrison, Oklahoma City, for defendant in error.

McINERNEY, Justice.

The sole question for decision is whether there was error in subjecting a foreign corporate defendant to suit in this state.

The present litigation was occasioned by the explosion in the communication building at a compressor station near Keyes, Oklahoma on April 29, 1960. The suit was commenced in February 1962, by Colorado Interstate Gas Company (CIG), owner of the compressor station. CIG is a Colorado corporation domesticated in Oklahoma. As trustee of its insurer (by whom it had been indemnified), CIG sought to recover from B. K. Sweeney Company (Sweeney) damages which resulted from the explosion. Sweeney, also a Colorado corporation, has no registered agent in Oklahoma and is not licensed to do business in this state. The liability CIG sought to impose was predicated on Sweeney's alleged negligence (a) in supplying an auxiliary electric generator (powered by natural gas) with a defective "demand regulator" which failed to shut off the fuel while power was not being generated; and (b) in failing "to replace, repair or adjust" the devices designed to prevent the escape of natural gas when the generator was not in operation. Trial culminated in a judgment for CIG.

Sweeney claims that since it could not be considered as "doing", "engaging in or transacting business" in Oklahoma, it was not amenable to service of process through the Secretary of State under the provisions of 18 O.S.1961, §§ 1.17(c) and 1.204a. This claim, first presented by Sweeney's special appearance, motion to quash and challenge to the (trial) court's jurisdiction, was later renewed in the answer. Reasserted in the motion for new trial, it is assigned in the petition in error. The error so tendered for our consideration stands properly preserved here for review.

In the latter part of July 1959, CIG ordered from Sweeney five electrical generating plants, propelled by natural gas, to provide auxiliary power for microwave equipment used in the operation of CIG's compressor stations located along its natural gas pipe line. The generators were designed to start automatically on failure of outside power, and to shut off on resumption of outside power.

This transaction was handled through an exchange of letters between CIG's Colorado Springs office and Sweeney's office in Denver. By its terms Sweeney undertook to ship the five generating plants "F.O.B. Destination—one each to Beaver and Keyes, Oklahoma and three to Morton Compressor Station"; it was "understood" that Sweeney would "supervise the start-up of the * * * units and make all necessary adjustments of the equipment as required to place (it) in first class running condition as per factory specifications"; and Sweeney expressly agreed to *"send our servicemen to Beaver, Keyes and Morton to check the installations and supervise the initial running"* of the equipment, if advised "a few days in advance" when "the five units are installed and ready to operate" (emphasis ours). According to the testimony, it was Sweeney's practice to "go into the field and * * * adjust these (generating) plants after they had been installed" because "we preferred to do it * * * (make a trial run) *at the job site"* (emphasis ours).

The Keyes installation was completed in the latter part of April. Anxious "to get the system underway", CIG appears to have sought, and claims to have procured, Sweeney's assent to a "start-up" before Sweeney's service manager could arrive for his scheduled inspection. The Keyes plant was accordingly started April 21, 1960 and again on April 22 of that year, without any supervision by Sweeney personnel. While the generator was in process of running an "exercise cycle" for the third time, a gas explosion and resulting damage occurred on April 29. Sweeney's service manager, who arrived at the station site on May 2, did not know that the explosion had taken place. After learning of its occurrence, he left to inspect the generator installations at the other CIG stations.

■ According to an early rule, the court was powerless to entertain an in personam action against a foreign corporation which had not submitted voluntarily to its jurisdiction. This was in keeping with the then current juristic thought that outside the jurisdiction of its creation a corporation had no existence in contemplation of law and no process could be served validly upon it. St. Clair v. Cox, 106 U.S. 350, 1 S.Ct. 354, 27 L.Ed. 222 (1882). As if unmindful of this limitation, corporations frequently carried on commercial activity outside the state of their incorporation, without actually consenting to be sued locally. The stubborn reality of economic life pulsating in the national market place confronted the U.S. Supreme Court with the task of evolving a test, consistent with the command of due process as it is embodied in the XIVth Amendment, for ascertaining the outer reach of the forum's authorized power to subject a foreign corporation to local suit. "* * * In a continuing process of evolution (the Court) * * * accepted and then abandoned (implied) 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over such corporations * * *" McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223. Ceaseless increase of corporate activity across the state lines, both in volume and intensity, brought about in part by improved transportation, has necessitated periodical reappraisals of past notions concerning the outer limit of state jurisdiction over foreign corporations. The need for revision gave birth to a trend toward expansion of constitutionally permissible scope of authorized state action. According to the test currently in use, "* * * due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within in the territory of the forum, he have cer-

tain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' ". International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102, 161 A.L.R. 1057, 1061.

■ The applicable statutes in force at the time this action was commenced, 18 O.S. 1961, §§ 1.17(c) and 1.204a, authorize service of process on "foreign corporations" that are "doing", "engaging in or transacting business" in Oklahoma. The quoted terms are merely descriptive. Their birth is attributable directly to federal constitutional limitations and they have been accordingly equated with the minimum requirements enjoined by the due process clause of the XIV Amendment to the U.S. Constitution. Marathon Battery Company v. Kilpatrick, Okl., 418 P.2d 900; Henry R. Jahn & Son, Inc. v. Superior Court, 49 Cal. 2d 855, 323 P.2d 437, 439; Stephenson v. Duriron Company, Alaska, 401 P.2d 423, 428. Whatever restriction these phrases may impose is merely co-extensive with, and identical to, that of the federal due process. The range of permissible state action is as wide and the boundary line extends as far under the Oklahoma "doing business" test as the minimum standards of federal due process permit. As Judge Murrah aptly noted in Steinway v. Majestic Amusement Co., 10 Cir., 179 F.2d 681, 18 A.L.R.2d 179, certiorari denied, 339 U.S. 947, 70 S.Ct. 802, 94 L.Ed. 1362, this court " * * * by a process of inclusion and exclusion, * * * (has) given the term (doing business) the same meaning and content generally accorded it by federal and other decisions, *which have construed it with an eye to due process* * * * " (emphasis ours). In the light of these authorities the question of "doing business" is synonymous with power to subject a foreign corporation to local jurisdiction. Our latest expressions in Marathon, supra, afford a very eloquent example of this court's traditional approach to the "doing business" formula of our statute. We there subjected many of

our past decisions to a thorough re-examination in the light of more recent U.S. Supreme Court pronouncements. As some of our previous expressions were found to be out of harmony with the pattern of pertinent federal and state adjudications of a more recent vintage, our review of this area resulted in overruling those of our prior cases which appeared incompatible with the mainstream of the current authoritative judicial thinking.

The standards which guide us in the application of our "doing business" test are parallel to those of the federal due process. Once placed in that perspective, the issue here is narrowly confined to whether, as a result of the single event arising from its transaction with CIG, Sweeney had such "substantial minimum contacts" with Oklahoma as to be amenable to suit here.

■ Absence of multiple acts within the state is not necessarily fatal to the exercise of state power over a foreign corporation. The widely spread myth that a single transaction by an out-of-state defendant may not be made the basis for amenability to suit in the state where such transaction occurred has been effectively "shattered" by federal approbation of non-resident motorist cases. The volume of business done in the state is not the only method by which the minimum contacts can be established. According to the more recent pronouncements of the Supreme Court, continuous activity of a foreign corporation within the state is not the sole, or even an indispensable prerequisite, justifying subjection to local suit. There exists no constitutional barrier to holding that a foreign corporation which does a single act or consummates a single transaction in the forum state would be amenable to suit for damages arising out of that transaction, irrespective of whether additional contacts with the state exist or not. The state may reach non-resident defendants in suits growing out of acts or transactions which have created "minimum contacts" with the forum state, however limited or transient such contacts may be. McGee v. International Life Ins. Co., supra;

Compania De Astral, S.A. v. Boston Metals Co., 205 Md. 237, 107 A.2d 357, 108 A.2d 372, 49 A.L.R.2d 646, certiorari denied, 348 U.S. 943, 75 S.Ct. 365, 99 L.Ed. 738; Smith v. Twin State Improvement Corp., 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193; Beck v. Spindler, 256 Minn. 543, 99 N.W.2d 670, 678; Deveny v. Rheem Manufacturing Company, 2nd Cir., 319 F.2d 124, 127; Stephenson v. Duriron Company, supra.

■ The generating plant whose defective safety devices allegedly occasioned the injurious event was sold by Sweeney *for delivery in Oklahoma*. Sweeney unequivocally undertook to service the equipment *at the jobsite* for the initial operation. These acts, as Sweeney knew or could know and anticipate, would have potential consequences in this state. If a foreign corporation voluntarily elects to act here, whether directly or indirectly, it should be answerable in our courts in accordance with our laws. The consequences we impute to it lie within its control. It need not act, or agree to act, within this state at all, unless it so desires.

The present suit grew out of Sweeney's acts which have created contacts with this state, however limited or transient these contacts may be regarded. The contacts, nonetheless, resulted in a tortious episode here, and this state "has a manifest (legitimate) interest in providing effective means of redress" when harm is occasioned within its territory. McGee v. International Life Ins. Co., supra, (355 U.S. 223, 78 S.Ct. 201, 2 L.Ed.2d 226).

Mindful that the conclusion reached here is not in harmony with some of our past expressions, predicated on now outdated notions of federal due process, we hereby overrule the following cases, insofar as they may be in conflict with this decision: Metal Door & Trim Company v. Hunt, 170 Okl. 240, 39 P.2d 72, 101 A.L.R. 350; Fuller v. Allen et al., 46 Okl. 417, 148 P. 1008; and Walden et. al. v. Automobile Brokers, Inc., 195 Okl. 453, 160 P.2d 400, 402.

■ This action, which was commenced before the passage of our so-called "long-arm" statute (12 O.S.1963 Supp. § 187, as amended by 12 O.S.1965 Supp. § 187), is not affected by that enactment; it is governed by the terms of 18 O.S.1961, §§ 1.17(c) and 1.204a.

The facts in the record afford ample basis for a finding that in the present action Sweeney was summoned to answer for the consequences of its "minimum contacts" with Oklahoma, and was hence amenable to suit in this state.

Affirmed.

JACKSON, C. J., IRWIN, V. C. J., and WILLIAMS, BERRY and HODGES, JJ., concur.

DAVISON, BLACKBIRD and LAVENDER, JJ., dissent.